UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ERIC E. HOYLE,

                                    Plaintiff,

                    -vs-                                            08-CV-347C

FREDERICK DIMOND, ROBERT DIMOND,
and MOST HOLY FAMILY MONASTERY,
a New York Not-for-Profit Corporation,

                                    Defendants.

_____

APPEARANCES:                   CHAMBERLAIN D'AMANDA OPPENHEIMER &
                               GREENFIELD LLP (K. WADE EATON, ESQ., OF
                               COUNSEL), Rochester, New York for Plaintiff.

                               DUKE, HOLZMAN, PHOTIADIS & GRESENS LLP,
                               (CHARLES C. RITTER, JR., ESQ., OF COUNSEL),
                               Buffalo, New York for Defendants.


## INTRODUCTION

        In this case, plaintiff seeks damages and restitution from defendants, who

operate the Most Holy Family Monastery ("MHFM") in Fillmore, New York.  Plaintiff

entered the monastery with the intention of becoming a Benedictine monk, but alleges

that he later determined that MHFM was not a Benedictine monastery and that he could

not become a Benedictine monk through his association with MHFM.  Plaintiff seeks to

recover those monies he donated to MHFM in reliance on their representations

regarding their affiliation with the Order of St. Benedict ("O.S.B.").  The case is currently

before the court on defendants' motion for summary judgment.  This Decision and

Order will address only that aspect of the defendants' motion that seeks dismissal of

the plaintiff's complaint.

## BACKGROUND

Plaintiff filed his original complaint on May 9, 2008 (Item 1).  He sued the defendants for return of all funds based on causes of action sounding in fraud, constructive fraud, unjust enrichment, and monies had and received.  *Id.*  In the complaint, plaintiff alleged that he learned of MHFM in 2005.  *Id.,* ¶ 15.  Plaintiff investigated the monastery through its website, which stated that MHFM was a Benedictine monastery supervised by Brother Michael Dimond, O.S.B., a Benedictine monk.[1]  *Id.,* ¶ 16.  Allegedly in reliance on this and other representations, plaintiff made cash contributions to MHFM of approximately $65,700 in cash and stocks worth $1.2 million, and took up residence at MHFM on September 27, 2005 .  *Id.,* ¶¶ 21, 26, 28.  Plaintiff further alleged that he executed a document, at the request of defendant Frederick Dimond, specifying that he was to receive $750,000 upon his departure from MHFM.  *Id.,* ¶¶ 29, 30.  Plaintiff alleged that he later learned that Frederick Dimond was not a member of the Order of St. Benedict and that MHFM was neither founded nor operated in accordance with the requirements of the Order of St. Benedict.  *Id.,* ¶ 31.  Plaintiff left MHFM on December 31, 2007.  *Id.,* ¶ 33.  The defendants have refused plaintiff's demand for the return of previously transferred funds.  *Id.,* ¶ 34.

Defendants filed an answer to the complaint on June 9, 2008 (Item 5), and

---

[1] Defendant Frederick Dimond uses the name "Brother Michael Dimond" and defendant Robert Dimond uses the name "Brother Peter Dimond."  The court will use the defendants' given names to identify them when necessary.

simultaneously filed motions to dismiss (Item 6) and for a preliminary injunction (Item 7).  In their motion to dismiss, the defendants asserted that this court lacked jurisdiction to hear the dispute as it would necessarily involve the interpretation of religious doctrine in violation of the First Amendment to the United States Constitution.  On July 16, 2008, plaintiff filed a motion to amend/correct the complaint (Item 20).  In an order dated July 23, 2008, the court granted the motion for preliminary injunctive relief and ordered plaintiff to "return to the defendants all confidential and proprietary records taken from [MHFM] in any form" and to remove confidential and proprietary information from any electronic storage devices in his possession (Item 23).

Plaintiff filed a response to the motion to dismiss (Item 26), and defendants filed a response to the motion to amend/correct (Item 25).  Oral argument on both motions was heard on August 18, 2008.  Thereafter, defendants filed a motion for contempt (Item 34) and plaintiff filed a motion for sanctions (Item 40) relating to the plaintiff's compliance with the preliminary injunction.  In a Memorandum and Opinion filed March 9, 2009, the court denied the defendants' motion to dismiss, granted the plaintiff's motion to amend the complaint, and denied the motions for contempt and for sanctions (Item 41).

Plaintiff filed the amended complaint on March 10, 2009, asserting 10 causes of action - fraud, constructive fraud/negligent misrepresentation, unjust enrichment/constructive trust, mandatory accounting, money had and received, violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c) and (d) ("RICO"), deceptive trade practices pursuant to New York General Business Law § 349, false advertising, and vicarious liability of MHFM (Item 42).

3

Defendants filed an answer to the amended complaint on March 20, 2009 and

interposed seven counterclaims for defamation/injurious falsehood, violation of the

Lanham Act, 28 U.S.C. § 1125 *et seq.,* interference with prospective advantage/tortious

interference with contract, conversion, breach of fiduciary duty, misappropriation of

trade secrets, and violation of the Electronic Communications Privacy Act, 18 U.S.C. §

2510 *et seq.* (Item 43).  Plaintiff filed his reply to the counterclaims on April 9, 2009

(Item 44).

Discovery was completed in approximately October 2011, but not before the

filing and disposition of numerous motions to compel by both parties (Items 50, 55, 64,

81).  On January 6, 2012, defendants filed this motion for summary judgment, seeking

dismissal of the complaint and judgment on their counterclaims (Item 89).  Plaintiff's

response to the motion was filed February 24, 2012 (Item 97) and defendants' reply

was filed March 16, 2012 (Item 105).  The court has determined that oral argument is

unnecessary.  For the reasons that follow, the defendants' motion for summary

judgment dismissing plaintiff's complaint is granted.


## FACTS[2]

During what can be characterized as a personal search for religious and spiritual

fulfillment, plaintiff was introduced to MHFM in 2005 and visited the monastery's

---

[2]  The factual statement is taken from the documents in support of and in opposition to the
defendants' motion for summary judgment including plaintiff's deposition testimony (Item 89, Exh. A), e-
mails between plaintiff and his financial advisor (Item 89, Exh. B), the declaration of Frederick Dimond
(Item 89, Att. 9), the Plaintiff's Declaration (Item 97), and the deposition transcript of Frederick Dimond
(Item 97, Att. 6).  Additionally, the court has considered the defendants' statement of undisputed facts
(Item 90) and plaintiff's response thereto (Item 97, Att. 4).

website (Item 89, Exh. B, hereafter "Hoyle Dep.," p. 104).  At that time, plaintiff had

rejected the Protestant faith of his family and adopted Catholicism.  He professed to

follow "the Roman Catholic religion as it has been practiced throughout the centuries"

and had rejected what he called "the Vatican II Church" (Hoyle Dep., pp. 19-21).[3]

Plaintiff does not recognize Pope Benedict XVI as the head of the Catholic Church and

considers those who knowingly adhere to the Vatican II Church to be heretics.  *Id.,* pp.

23, 27-28.

At all times relevant to this dispute, the MHFM website included a history of the

monastery and stated that MHFM was founded by Brother Joseph Natale, O.S.B., who

was trained at St. Vincent's Archabbey in Latrobe, Pennsylvania.  In the 1960's, Brother

Joseph reportedly left St. Vincent's with the permission of the Archabbot to start his

own Benedictine community in New Jersey.  In 1994, the community was given a parcel

of land in New York State and Brother Joseph intended to move the community there.

Before he could do so, Brother Joseph died on November 11, 1995.  Brother Michael

Dimond was elected superior of the community and moved MHFM to its current location

in Fillmore, New York in late 1997.  *See* Item 18, Att. 17.

MHFM holds itself out as a "Traditional" Catholic Benedictine monastery (Item

89-9, Declaration of Frederick Dimond, hereafter "Dimond Decl.," ¶ 3).  According to the

defendants, a "Traditional Catholic" believes that the modern Catholic Church is a

departure from traditional Catholic teaching, and rejects the Vatican II Church and the

"New Mass."  *Id.*  Defendants "do not accept the post-Vatican claimants to the Papacy

---

[3] As plaintiff defines it, the "Vatican II Church" is the modern Roman Catholic Church, headed by Pope Benedict XVI.

as valid popes and believe that the Papacy is currently vacant." *Id.*  MHFM's mission is "dedicated to defending and spreading the true Catholic Faith, as taught and defined by the authoritative teachings of the true popes throughout history." *Id., ¶* 10.  Defendants have never represented MHFM to be a Vatican II Benedictine monastery, but claim to be a Traditional Catholic Benedictine monastery. *Id., ¶* 11.

Prior to joining MHFM, plaintiff reviewed the website and was thereby advised of MHFM's position that it was not affiliated with then-Pope John Paul II or the Benedictine order as recognized by the modern Catholic Church (Hoyle Dep., p. 257).  Plaintiff knew when he entered MHFM that it condemned as false all of the monasteries that fell under what could be characterized as the publicly recognized Order of St. Benedict and he was in agreement with that position. *Id.,* p. 258.  Plaintiff admitted that one of the reasons he joined MHFM was that the defendants did not recognize John Paul II as Pope. *Id.*  He agreed with the defendants that monasteries that were part of the publicly recognized Order of Saint Benedict accepted the Vatican II Church and thus were not legitimately Benedictine. *Id.,* p. 260.  Additionally, plaintiff was aware that monasteries that were part of the publicly recognized Order of St. Benedict did not recognize MHFM as an approved Benedictine monastery. *Id.,* p. 261.  Before plaintiff entered MHFM, the defendants clearly stated their theological position that they did not regard as legitimately Catholic any of the monasteries of the publicly recognized Order of St. Benedict. *Id.,* p. 262.

In 2005, plaintiff believed it was very important to spread the MHFM message and wanted to make a considerable donation to that end (Hoyle Dep., p. 144).  Plaintiff

wrote in his journal that he learned "that to be a monk or a Benedictine these days takes nothing more than to profess the faith, vow chastity to God and live in a manner vaguely similar to the Rule of St. Benedict." *Id.,* p. 145.  Prior to entering MHFM, plaintiff had numerous telephone conversations with Frederick Dimond and ordered copies of and reviewed the defendants' written materials and compact discs. *Id.,* p. 52.

In e-mail correspondence to Brad King, his financial advisor, in April 2005, plaintiff wrote that his money had become "an undesired burden" and that he fully intended to "give away the vast majority of my money to good Catholic persons and organizations" (Dimond Decl., Exh. B;  Hoyle Dep., pp. 163-64).  Plaintiff told his financial advisor that he wanted to make a $300,000 donation to MHFM, a group he felt deserved "some serious money"  (Hoyle Dep., p. 165).  Plaintiff also stated that his "financial plan for the future is quite literally to give my money away." *Id.,* p. 166.  Mr. King convinced plaintiff to reduce the amount of the donation. *Id.,* p. 170.  Plaintiff then donated $700 to MHFM which was acknowledged by defendants in a letter (Dimond Decl., Exh. A).  In June 2005, plaintiff donated $65,000 to MHFM, a contribution which was also acknowledged in writing by defendants. *Id.,* Exh. B.

It was plaintiff's understanding that to enter MHFM, he would be required to relinquish his assets to the monastery.  Plaintiff admitted that Frederick Dimond did not require that he donate all his money to MHFM (Hoyle Dep., p. 181).  Defendant Frederick Dimond told plaintiff that he should chose an amount that would revert to him if he left the monastery. *Id.*  In e-mail correspondence to Frederick Dimond dated August 30, 2005, plaintiff stated that he needed to keep money in reserve to pay capital

7

gains taxes.  He also stated that he planned "to give the vast majority of my holdings as an outright gift" to MHFM and that he wished to receive "around $30,000" if he departed MHFM (Dimond Decl., Exh. C).  In his Declaration, defendant Frederick Dimond stated that plaintiff ultimately decided to make all of his assets an outright gift to MHFM, as well as his future inheritance assets.  *Id.,* ¶ 26.  Plaintiff recommended to defendants that MHFM hold his donation in a stock account so that they would have easier access to it (Hoyle Dep., p. 182).  In the August 2005 e-mail to Frederick Dimond, plaintiff did not suggest that any portion of his gift be reserved to revert back to plaintiff upon his departure.  *Id.,* p. 183.

Plaintiff visited MHFM twice during the summer of 2005 and entered the monastery in September 2005 (Hoyle Dep., pp. 50-51).   While at MHFM, plaintiff assisted the defendants in updating and maintaining their website.  *Id.,* p. 53.  He was involved in production work associated with radio discussions and debates about Catholicism.  *Id.*   Plaintiff answered the telephone at MHFM and discussed religious issues with callers.  *Id.,* p. 57.  He managed MHFM's online store, handled all telephone, internet, and mail-generated orders and managed MHFM's database of customers, clients, supporters, and benefactors (Dimond Decl., ¶ 49).  During plaintiff's time at MHFM, he had no disagreement with the beliefs and teachings of the defendants (Hoyle Dep., p. 49).  At the time plaintiff joined MHFM, he believed that St. Vincent's Archabbey had strayed from true Catholic doctrine and, as such, was no longer truly Benedictine.  *Id.,* p. 299.  Plaintiff conceded that the defendants made no false statements to him regarding their Catholic beliefs.  *Id.,* 302.

8

In November 2005, plaintiff made a donation to MHFM of stock worth $1,233,100 which was acknowledged in writing on March 27, 2006 (Item 89, Dimond Decl. Exh. D). In e-mail correspondence from his tax preparer dated January 91, 2006, plaintiff was advised that the tax preparer treated plaintiff's stock donation "as gifts to qualifying 501(c)(3) organizations" and that he needed a receipt from MHFM before his 2005 taxes could be filed (Item 89, Dimond Decl., Exh. E).  At the time of this transfer of stock to MHFM, plaintiff reserved several hundred thousand dollars of additional assets in his own name (Hoyle Dep., p. 223).  There was no written agreement regarding an amount of that transfer to MHFM that would be reserved and returned to plaintiff upon his departure. *Id.*

In April 2006, plaintiff intended to make another million dollar donation to MHFM when he received the assets of a trust fund.  At that time, plaintiff prepared a second document that acknowledged a gift to MHFM of $750,00.00.  Frederick Dimond testified that this second receipt was prepared based on the expectation of an additional million dollar gift and that, should it receive another million dollars from plaintiff, MHFM would then have "the flexibility to possibly give him $483,000 back" if he left the monastery (Item 97, Dimond Dep., p. 65).[4]  Defendant Dimond stated that there was never any agreement, either written or verbal, or any "guarantee that [plaintiff] would receive money back" if he left MHFM *Id.,* pp. 64-65.  Plaintiff's mother and grandmother blocked the transfer of the additional million dollars to plaintiff until he reached age 35 (Hoyle Dep., pp. 78-79).  On October 1, 2007, defendants acknowledged plaintiff's

---

[4] $483,000.00 is the difference between the amount of plaintiff's donation of 1.2 million dollars and the later-acknowledged amount of $750,000.00.

additional gift of stock worth $307,989 (Item 89, Dimond Decl., Exh. F).  Plaintiff's tax

filings for 2005 indicate that plaintiff made a charitable donation to MHFM of $750,000.

*Id.,* p. 233.[5]  Plaintiff's 2006 tax return indicated a charitable donation to MHFM of

$307,989.  *Id.,* p. 234.[6]

      While living at MHFM, plaintiff believed that MHFM was the only true Catholic

community (Hoyle Dep., p. 151).  However, he struggled with the decision whether to

stay at MHFM or to live as a celibate man and practice the Catholic religion on his own.

*Id.,* p. 153.  Plaintiff admitted that he did not like the "nocturnal" hours at MHFM, the

lack of cleanliness of the shower stall, and the defendants' participation in unproductive

activities such as board games.  *Id.,* pp. 11-12.  During his time at MHFM, plaintiff had

several discussions with the defendants on the issue of mass attendance.  *Id.,* p. 59.

The defendants had concluded that it was proper to attend mass offered by a priest of

the Eastern Rite of the Vatican II Church and plaintiff accepted the defendants'

conclusions regarding mass attendance.  *Id.,* p. 109.

      In December 2007, defendant Frederick Dimond decided to move MHFM's

stocks and investments from M&T Securities to a Scottrade account and to give plaintiff

the authority to transfer funds (Dimond Decl., ¶ 50; Hoyle Dep., p. 62-63).   Plaintiff

testified that on December 30, 2007, he read an article on mass attendance by a former

member of MHFM, Richard Ibranyi, and decided that defendants' position on this issue

---

[5]  Plaintiff's 2005 donations resulted in a charitable donation deduction of $384,079.00 against income of $1,061,262.00 for tax year 2005 with an allowable carryover of $269,000 (Hoyle Dep., pp. 229 - 231).

[6]  Plaintiff's 2006 donations to MHFM resulted in a charitable deduction of approximately $35,000.00 against income of $69,000.00 for tax year 2006 and a carryover of $258,000.00 (Hoyle Dep., p. 236).

was wrong (Hoyle Dep., pp. 50, 60).  He did not discuss his disagreement with the defendants, but abruptly decided to leave MHFM.  *Id.,* p. 60.  There is no reference to the mass attendance issue in plaintiff's journal entry for December 30, 2007.  *Id.*  On the morning of December 31, 2007, plaintiff attempted to transfer funds online from MHFM's Scottrade account into his personal bank account, but was unable to do so because the transaction required a second signature.  *Id.,* p. 66.  Later that day, after he left MHFM, plaintiff telephoned the Scottrade office in Rochester, New York, but the representative would not discuss the account with him.  *Id.,* p. 68.

 After leaving MHFM, plaintiff telephoned the New York State Police and reported that the defendants had stolen approximately $460,000 or $470,000 from him (Hoyle Dep., pp. 210-11).  State Trooper LaRose asked plaintiff if he had a written agreement regarding the return of funds, and plaintiff could not recall if there was such a document.  *Id.,* p. 212.  Plaintiff also accused defendant Frederick Dimond of being a dangerous driver.  *Id.*,  p. 208.

At his deposition, plaintiff testified that he believed he was entitled to the return of money in an amount agreed upon in a conversation he had with Frederick Dimond in approximately April 2006 (Hoyle Dep., p. 71).  Plaintiff further testified that he prepared a handwritten document in which he stated that he was to receive $750,000 if he were to leave MHFM.  *Id.,* p. 74.   Plaintiff does not have the document and does not know whether it was ever signed.  *Id.,* p. 75.

When he left MHFM, plaintiff took business records with him, including MHFM's bank and investment account records and customer and donor information (Dimond

11

Decl. ¶ 55).  Additionally, plaintiff took the laptop computer that housed much of this information, despite having previously donated the computer to MHFM.  *Id.,* ¶ 56. Following his departure from MHFM, plaintiff contacted supporters of MHFM and set up his own website that condemned MHFM as heretical.  *Id.,* ¶ 59, Exhs. J, K)

Plaintiff criticized the defendants for their practice of rounding down the weight of UPS packages that were sent out to MHFM's customers, but admitted that he himself weighed packages in this manner (Hoyle Dep., p. 283).  Plaintiff admitted that he did not research the Benedictine Confederation[7] in April 2005 or at any time that he was at MHFM.  *Id.,* pp. 90-91.  It was not until after he left MHFM that plaintiff researched the Confederation.  *Id.*

In opposition to the motion for summary judgment, plaintiff has submitted an e-mail message from Douglas R. Nowicki, O.S.B., the Archabbot of St. Vincent's Archabbey (Item 97, Exh. A).  Mr. Nowicki stated that, according to his records, Joseph Natale "came to Saint Vincent as a candidate for the lay brotherhood on July 5, 1960. He remained for several months as a postulant but he did not receive vows as a Benedictine monk."  *Id.*  Mr. Nowicki further stated that Mr. Natale does not appear in the directory of members of the Benedictine communities and that MHFM does not appear in the directory of approved Catholic organizations.  *Id.*  Plaintiff also submitted an article by Richard Ibranyi entitled "Against the Dimonds" (Item 97, Exh. B).  In It, Mr. Ibranyi states that Joseph Natale "never got the approval from the Archabbot to start an order or a monastery."  *Id.,* p. 59.  Mr. Ibranyi accused the Dimonds of claiming to be

---

[7] The Benedictine Confederation is the international governing body of the Order of St. Benedict.

12

Benedictines "based upon your own word, upon your own authority. That is not, and never can be the way men become Benedictines." *Id.,* p. 60.

## DISCUSSION

### 1.  Summary judgment Standard

The standard for granting summary judgment is well established.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Gallo v. Prudential Residential Servs., Ltd. P' ship*, 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  *Gallo,* 22 F.3d at 1224.  The moving party bears the initial burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323.  The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment is appropriate if it appears that the nonmoving party cannot prove an element that is essential to the nonmoving party's case and on which it will

bear the burden of proof at trial. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805–06 (1999); *Celotex,* 477 U.S. at 322; *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also Gallo,* 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its initial burden of showing a lack of a material issue of fact, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993); *see also Scotto v. Almenas,* 143 F.3d 105, 114–15 (2d Cir. 1998).

## 2.  Defendants' Motion to Dismiss Plaintiff's Complaint

All of plaintiffs claims are based on his assertion that the defendants misrepresented their status as Benedictine monks and the association of MHFM with the Order of St. Benedict. Plaintiff maintains that the defendants marketed publications, solicited donations, and invited membership in their community based on this false representation. He also claims that he was misled into believing that he could become a Benedictine monk through his association with MHFM.

14

The First Amendment, applicable to the states by the Fourteenth Amendment, prohibits the making of "law[s] respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Constitution, 1st Amendment.  Consistent with the First Amendment, courts are forbidden from interfering in or determining religious disputes. The Constitution directs that religious bodies are to be left free to decide church matters for themselves, uninhibited by state interference.  *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709 (1976); *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952).  The Constitution limits judicial involvement in disputes raising religious concerns, and courts are prohibited from resolving controversies which require consideration of religious doctrine.  *Avitzur v. Avitzur*, 446 N.E.2d 136, 138 (N.Y.), *cert. denied*,  464 U.S. 817 (1983); *see also Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440 (1969).  However, "courts are free to decide such disputes if they can do so without resolving underlying controversies over religious doctrine." *Park Slope Jewish Center v. Congregation B'nai Jacob*, 686 N.E.2d 1330, 1331 (N.Y. 1997).  This "neutral principles of law" approach requires the court to apply objective, well-established principles of secular law to the issues, without reference to any religious principle.  *Avitzur*, 446 N.E.2d at 138.

In opposing the defendants' earlier motion to dismiss, plaintiff stated that the "only issue to be decided with regard to the fraud claims is whether the defendants are, or are not, affiliated with the universally recognized and sanctioned Order of St. Benedict."  Item 26, p. 3.  As the issue was framed on the motion to dismiss, it seemed to require a neutral factual determination of the defendants' recognition by an

established governing body.  Following discovery and the narrowing of the issues,

however, it is apparent that plaintiff knew from the outset that MHFM was not

recognized by the established Order of St. Benedict and purposely joined the

monastery for that reason.  Plaintiff testified that he believed that MHFM operated as an

independent Benedictine community, consistent with the Rule of St. Benedict and

outside the governance of the modern Catholic Church (Hoyle Dep., pp. 257-265, 281).

Plaintiff now alleges that the defendants misrepresented MHFM's historical

connection with the Order of St. Benedict through St. Vincent's Archabbey, and he

contends that he relied on this asserted historical connection to his detriment.  Plaintiff

states that he sought a "true" Catholic Church unaffiliated with the Vatican II Catholic

Church, and was attracted to MHFM based on its association with the Order of St.

Benedict and its "assurance of historical legitimacy and spiritual authenticity."

Memorandum of Law, Item 97, p. 11.  As outlined above, the MHFM website stated that

MHFM was founded by Brother Joseph Natale, O.S.B. with the permission of the

Archabbot of St. Vincent's Archabbey.  Plaintiff now asserts that Joseph Natale was not

a Benedictine monk, merely a postulant, and did not have permission from the

Archabbot of St. Vincent's to establish MHFM.  Plaintiff argues that, as MHFM was not

established according to the conventions of the recognized Order of St. Benedict,

MHFM is not a true Benedictine community

Defendants deny that they misrepresented their doctrinal views or their status as

Benedictines, and further argue that this dispute cannot be adjudicated without

interpreting religious doctrine, specifically the requirements and obligations that must be

fulfilled in order for one to become a Benedictine monk and for a monastery to be

16

considered a Benedictine community.  It is undisputed that MHFM operates as a

religious organization and not-for-profit corporation.  The defendants consider

themselves an independent Benedictine community operating outside the governance

of the Benedictine Confederation and the Catholic Church.  Under the "neutral

principles of law" approach, this court could properly determine whether MHFM is

affiliated with the recognized Order of St. Benedict, but it is a doctrinal issue whether

MHFM operates according to the Rule of St. Benedict and can self-identify as a

Benedictine monastery.  Defendants believe they are Benedictines, and have a

theological basis for this belief.  Apparently, there are critics of MHFM who reject this

self-identification.  At the time he donated money to MHFM and joined the monastery,

plaintiff knew that MHFM was not recognized by the Order of St. Benedict, but accepted

it as Benedictine nonetheless.  The First Amendment protects the rights of the

defendants to decide matters of faith free from state intrusion. To the extent that

plaintiff asks this court to determine whether MHFM is a true Benedictine community,

such an inquiry would require the resolution of theological issues and religious doctrine

and is prohibited by the First Amendment.

Plaintiff has attempted to frame the issue narrowly, asking the court to determine

the circumstances surrounding the establishment of MHFM and whether the defendants

misrepresented the history of the monastery on the MHFM website.  Under the "neutral

principles of law" approach, this court could possibly determine whether Joseph Natale

took vows as a Benedictine monk and/or whether he had the permission of the

Archabbot of St. Vincent's to establish MHFM.  However, the court is not convinced it

should delve into the genesis of MHFM, just as it would be improper for a civil court to

question the circumstances of the establishment of any religious group or sect.  In any

event, this court need not assess the accuracy of the defendants' purported history of

MHFM, as plaintiff has presented no admissible evidence to refute the circumstances of

the monastery's establishment as set forth on the MHFM website.

A summary judgment "opponent must do more than simply show that there is

some metaphysical doubt as to the material facts."  *Matsushita,* 475 U.S. at 586

(citations omitted).  An affidavit or declaration submitted in opposition to a motion "must

be made on personal knowledge, set out facts that would be admissible in evidence,

and show that the affiant or declarant is competent to testify on the matters stated."

Fed. R. Civ. P. 56(c)(4).  Plaintiff's Declaration (Item 97), in which he disputes the

circumstances of the establishment of MHFM, is not based on plaintiff's personal

knowledge, but rather on the hearsay statements found in the article by Richard Ibranyi

and the e-mail from the current Archabbot of St. Vincent's.  At this point in time, it

appears there are no living witnesses with personal knowledge as to whether Joseph

Natale received "permission" to establish MHFM.  Hearsay and conclusory assertions

that would not be admissible at trial are insufficient to create a genuine issue for trial.

*See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir. 2004).

As will be discussed below, each of plaintiff's claims is based on his assertion

that the defendants misrepresented their status as Benedictine monks and the

affiliation of MHFM with the Order of Saint Benedict.  Questions regarding the

establishment of MHFM as a Benedictine community and its current identification as a

"traditional" Catholic Benedictine monastery are matters of religious doctrine over which

the court has no jurisdiction.  Moreover, plaintiff has failed to raise a genuine issue of

material fact regarding the establishment of MHFM.  Accordingly, the defendants have established that they are entitled to judgment as a matter of law and the complaint must be dismissed.

### A.  Fraud and Negligent Misrepresentation

"To prove fraud under New York law, 'a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance.'" *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 19 (2d Cir.1996) (quoting *Banque Arabe et Internationale d'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995)).  The elements of a negligent misrepresentation claim are that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment."  *Hydro Investors, Inc. v. Trafalgar Power Inc.,* 227 F.3d 8, 20 (2d Cir. 2000).

Both of these causes of action require a material misrepresentation and plaintiff's reliance upon it.  It is apparent from plaintiff's deposition testimony that he was not misled with regard to the status of MHFM.  He was aware that MHFM was not affiliated with the Catholic Church under then-Pope John Paul II and that the defendants condemned as false all the monasteries under what may be characterized as the

officially recognized Order of St. Benedict (Hoyle Dep., pp. 257-58).  Although he now

argues that the defendants misrepresented the genesis of MHFM, plaintiff has

presented no admissible proof that MHFM was founded other than according to the

information on the MHFM website.  Accordingly, plaintiff has failed to raise a genuine

issue of material fact with regard to his reliance on a material misrepresentation and

these claims must be dismissed.

### B.  RICO Claims

Plaintiff alleges that the defendants committed substantive RICO offenses in

violation of 18 U.S.C. § 1962(c) and conspired to violate RICO in violation of 18 U.S.C.

§ 1962(d).  A substantive civil RICO claim has three elements: (1) a violation of the

RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the

injury was caused by the violation of Section 1962.  *Spool v. World Child Int'l Adoption*

*Agency,* 520 F.3d 178, 183 (2d Cir. 2008).  To plead a violation of Section 1962(c), a

plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of

racketeering activity" for each individual defendant.  *DeFalco v. Bernas*, 244 F.3d 286,

306 (2d Cir. 2001) (citations omitted).

Plaintiff alleges that defendants have violated RICO, through acts of mail fraud,

bank fraud, and wire fraud, by falsely promoting MHFM as a Benedictine community,

and selling publications, soliciting donations, and inviting membership in the monastery

based on MHFM's Benedictine affiliation.  As stated above, whether MHFM is truly a

Benedictine community and whether the Dimond defendants can use the title  "O.S.B."

are questions that cannot be determined without delving into doctrinal issues in violation

20

of the First Amendment.  Additionally, it is undisputed that defendants did not represent

themselves as being affiliated with the recognized Order of St. Benedict and specifically

stated on the website that they rejected the Vatican II Catholic Church.  As with his

fraud claims, plaintiff has submitted no admissible proof to suggest that the defendants

misrepresented the establishment of MHFM.  Accordingly, the RICO claims must be

dismissed.

### C.  Claims under New York General Business Law

Plaintiff alleges that the defendants violated New York General Business Law §§

349 and 350 by engaging in deceptive practices and false advertising.  As with the

fraud claims, the General Business Law provisions require a showing of a

misrepresentation or misleading practice that caused plaintiff's injury.  Specifically,

plaintiff alleges that defendants falsely held themselves out as Benedictine monks and

MHFM as a Benedictine monastery and that he transferred over a million dollars worth

of his personal assets based on this representation.  As stated above, at the time he

made his donations, plaintiff was aware of the defendants' doctrinal beliefs and

understood the operation of MHFM as an independent Benedictine community outside

the governance of the recognized Order of St. Benedict.  The defendants' status as

Benedictines and the operation of MHFM as a Benedictine monastery are doctrinal

issues over which this court has no jurisdiction.  Moreover, plaintiff has failed to submit

admissible proof sufficient to raise a genuine issue of material fact with regard to the

circumstances of the establishment of MHFM.  Accordingly, plaintiff has failed to show

a misleading or deceptive business practice, and the General Business Law claims

must be dismissed.

### D.  Plaintiff's Equitable Claims

Finally, plaintiff has alleged equitable claims for unjust enrichment, for money had and received, and for a mandatory accounting.  All of these claims are based on the premise that plaintiff was falsely led to believe that the defendants were Benedictine monks, that MHFM was a Benedictine monastery, and that he could become a Benedictine monk through study at MHFM.  As with his other claims, plaintiff asks this court to determine whether MHFM was truly a Benedictine community, a determination that is outside this court's jurisdiction.  A review of the record indicates that plaintiff was aware that MHFM was not affiliated with the publicly recognized Order of St. Benedict and that it operated as an independent Benedictine community.  Whether MHFM is a "true" Benedictine monastery is a doctrinal question over which this court has no jurisdiction.  To the extent that plaintiff now argues that the defendants misrepresented the history of the monastery on the MHFM website, he has presented no admissible proof to raise a genuine issue of material fact.

The court notes that plaintiff has not alleged a contract claim based on the purported written document in which plaintiff alleges he specified the amount of money to be returned to him - $750,000.00 - upon his leaving MHFM.  However, in response to the motion for summary judgment, plaintiff argues that his equitable claims arise from this agreement and that he has raised genuine issues of fact with regard to this "informal written instrument" (Item 97, p. 12).  Plaintiff has alleged that he was advised by Frederick Dimond that, to enter MHFM, he must shed his worldly possessions and turn them over to the monastery.  Additionally, Frederick Dimond admitted that he advised plaintiff to execute a written document specifying the amount of money plaintiff

wished to receive if he were to leave MHFM. Plaintiff alleges that he drafted a document in which he specified that he was to receive $750,000.00 upon leaving the monastery (Item 42, ¶ 45). Plaintiff is unable to produce this document and, when asked by Trooper LaRose immediately after leaving MHFM, plaintiff could not recall if such a document existed. Defendant Dimond states that plaintiff decided to donate all his assets to MHFM and expected nothing in return if he left MHFM. The only written record of plaintiff's intention with regard to this matter is plaintiff's e-mail of August 2005, in which plaintiff suggested $30,000.00 as an appropriate and adequate amount to receive back upon leaving MHFM. Frederick Dimond testified that there was never any agreement, either verbal or written, by which plaintiff was guaranteed to receive any money upon leaving MHFM (Dimond Dep., pp. 64-65).

"In order to succeed on a claim for unjust enrichment under New York law, a plaintiff must prove that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Diesel Props. S.r.L. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011) (internal quotations omitted). Similarly, "[t]he essential elements of a claim for money had and received are that (1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." *Nordlicht v. N.Y. Tel. Co.,* 799 F.2d 859, 865 (2d Cir. 1986), *abrogated on other grounds by Fax Telecommunicaciones Inc. v. AT & T,* 138 F3d 479 (2d Cir. 1998) (internal quotations omitted). Under New York law, an accounting is a cause of action that seeks "an adjustment of the accounts of the parties and a rendering of a judgment

23

for the balance ascertained to be due." *DiTolla v. Doral Dental IPA of New York, LLC*, 469 F.3d 271, 275 (2d Cir. 2006) (internal quotations omitted).

Despite plaintiff's assertion of a written document, he has not produced a contract specifying an amount of money to be returned to him and has not pled a claim for breach of contract.  He asks this court to examine the equities and find that the defendants have been wrongfully enriched by his donations to MHFM.  The record reflects that plaintiff was not misled regarding MHFM's lack of affiliation with the recognized Order of St. Benedict and that he agreed with the defendants' view of traditional Catholicism.  Plaintiff admitted that the Dimonds never required that he donate all his money to the monastery, yet he chose to make substantial donations to MHFM and  never specified in writing the amount he sought upon leaving the monastery.  His assertion now that he was misled as to the establishment of MHFM as a Benedictine community requires a examination of doctrinal issues that is prohibited by The First Amendment.  As plaintiff has not raised a genuine issue of material fact to suggest that he was the victim of a fraudulent misrepresentation, the defendants have established that they are entitled to judgment as a matter of law on the equitable claims.

**CONCLUSION**

Defendants' motion for summary judgment is granted in part and the complaint is dismissed.  The parties will participate in a telephone conference on July 11, 2012 at 2 p.m.  to discuss the defendants' counterclaims.  The court will initiate the call.

24

So ordered.


_____\s\ John T. Curtin_____
JOHN T. CURTIN
United States District Judge

Dated: June 22, 2012
p:\pending\2008\08-347.jun712