UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ERIC E. HOYLE,

                                    Plaintiff,

            -vs-                                              08-CV-347C

FREDERICK DIMOND, ROBERT DIMOND,
and MOST HOLY FAMILY MONASTERY,
a New York Not-for-Profit Corporation,

                                    Defendants.

_____

APPEARANCES:                    WYNN L. BOWMAN, ESQ., Rochester, New York for
                                Plaintiff.

                                DUKE, HOLZMAN, PHOTIADIS & GRESENS LLP,
                                (CHARLES C. RITTER, JR., ESQ., OF COUNSEL),
                                Buffalo, New York for Defendants.

**INTRODUCTION**

        Plaintiff commenced this action seeking damages and restitution from

defendants Frederick and Robert Dimond, who operate the defendant not-for-profit

corporation Most Holy Family Monastery ("MHFM") in Fillmore, New York.  Specifically,

plaintiff sought to recover monies he donated to MHFM allegedly in reliance on the

defendants' representations regarding their affiliation with the Order of St. Benedict

("O.S.B.").  In a Decision and Order dated June 22, 2012, the court granted the

defendants' motion for summary judgment in part and dismissed the plaintiff's

complaint, but held in abeyance that aspect of the defendants' motion in which they

sought judgment on their counterclaims (Item 106).  As the parties have been

unsuccessful in their attempts to resolve the case through mediation, the court will now

address the remainder of the defendants' motion for summary judgment (Item 89).


## BACKGROUND

Plaintiff filed his original complaint on May 9, 2008 (Item 1).  In it, he alleged that

he learned of MHFM in 2005.  *Id., ¶* 15.  Plaintiff investigated the monastery through its

website, which stated that MHFM was a Benedictine monastery supervised by Brother

Michael Dimond, O.S.B., a Benedictine monk.[1]  *Id., ¶* 16.  Allegedly in reliance on this

and other representations, plaintiff made contributions to MHFM of approximately

$65,700 in cash and stocks worth $1.2 million, and took up residence at MHFM on

September 27, 2005 .  *Id., ¶¶* 21, 26, 28.  Plaintiff further alleged that he executed a

document, at the request of defendant Frederick Dimond, specifying that he was to

receive $750,000 upon his departure from MHFM.  *Id., ¶¶* 29, 30.  Plaintiff alleged that

he later learned that Frederick Dimond was not a member of the Order of St. Benedict

and that MHFM was neither founded nor operated in accordance with the requirements

of the Order of St. Benedict.  *Id., ¶* 31.  Plaintiff left MHFM on December 31, 2007.  *Id.,*

¶ 33.  The defendants have refused plaintiff's demand for the return of previously

transferred funds.  *Id., ¶* 34.

Plaintiff filed an amended complaint on March 10, 2009, asserting 10 causes of

action - fraud, constructive fraud/negligent misrepresentation, unjust

---

[1]  Defendant Frederick Dimond uses the name "Brother Michael Dimond" and defendant Robert Dimond uses the name "Brother Peter Dimond."  The court will use the defendants' given names to identify them when necessary.

enrichment/constructive trust, mandatory accounting, money had and received, violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c) and (d) ("RICO"), deceptive trade practices pursuant to New York General Business Law § 349, false advertising, and vicarious liability of MHFM (Item 42). Defendants filed an answer to the amended complaint on March 20, 2009 and interposed seven counterclaims for defamation/injurious falsehood, violation of the Lanham Act, 28 U.S.C. § 1125 *et seq.,* interference with prospective advantage/tortious interference with contract, conversion, breach of fiduciary duty, misappropriation of trade secrets, and violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq.* ("ECPA") (Item 43).  Plaintiff filed his reply to the counterclaims on April 9, 2009 (Item 44).

On January 6, 2012, defendants filed this motion for summary judgment, seeking dismissal of the complaint and judgment on their counterclaims (Item 89).  Plaintiff's response to the motion was filed February 24, 2012 (Item 97) and defendants' reply was filed March 16, 2012 (Item 105).  As stated above, the court granted the defendants' motion for summary judgment in part and dismissed the plaintiff's complaint, but held in abeyance that aspect of the defendants' motion in which they sought judgment on their counterclaims (Item 106).  As the parties were unable to resolve the remainder of the case through mediation, the court will now address the motion for summary judgment on the defendants' counterclaims.  For the reasons that follow, the remainder of  defendants' motion for summary judgment is denied in part. Additionally, the court grants summary judgment to plaintiff, *sua sponte,* on defendants counterclaims under the Lanham Act and the ECPA.

3

**FACTS**[2]

The court will assume some familiarity with the facts of this case.  Briefly, in 2005, plaintiff was introduced to MHFM and visited the monastery's website (Item 89, Exh. B, hereafter "Hoyle Dep.," p. 104).  At that time, plaintiff professed to follow "the Roman Catholic religion as it has been practiced throughout the centuries" and rejected what he called "the Vatican II Church" (Hoyle Dep., pp. 19-21).[3]

In 2005, plaintiff believed it was very important to spread the MHFM message and wanted to make a monetary donation to that end (Hoyle Dep., p. 144).  In e-mail correspondence to his financial advisor, plaintiff wrote that his money had become "an undesired burden" and that he fully intended to "give away the vast majority of my money to good Catholic persons and organizations" (Dimond Decl., Exh. B;  Hoyle Dep., pp. 163-64).  Plaintiff told his financial advisor that he wanted to make a $300,000 donation to MHFM, a group he felt deserved "some serious money"  (Hoyle Dep., p. 165).  Plaintiff also stated that his "financial plan for the future is quite literally to give my money away." *Id.,* p. 166.  The financial advisor convinced plaintiff to reduce the amount of the donation.  *Id.,* p. 170.  Plaintiff then donated $700 to MHFM which was acknowledged by defendants in a letter (Dimond Decl., Exh. A).  In June 2005, plaintiff

---

[2]  The factual statement is taken from the documents in support of and in opposition to the defendants' motion for summary judgment including plaintiff's deposition testimony (Item 89, Exh. A), e-mails between plaintiff and his financial advisor (Item 89, Exh. B), the declaration of Frederick Dimond (Item 89, Att. 9), the Plaintiff's Declaration (Item 97), and the deposition transcript of Frederick Dimond (Item 97, Att. 6).  Additionally, the court has considered the defendants' statement of undisputed facts (Item 90) and plaintiff's response thereto (Item 97, Att. 4).

[3]  As plaintiff defines it, the "Vatican II Church" is the modern Roman Catholic Church.

donated $65,000 to MHFM, a contribution which was also acknowledged in writing by defendants. *Id.,* Exh. B.

It was plaintiff's understanding that to enter MHFM, he would be required to relinquish his assets to the monastery.  Plaintiff admitted that Frederick Dimond did not require that he donate all his money to MHFM (Hoyle Dep., p. 181).  Defendant Frederick Dimond told plaintiff that he should chose an amount that would revert to him if he left the monastery.  *Id.*  In e-mail correspondence to Frederick Dimond dated August 30, 2005, plaintiff stated that he needed to keep money in reserve to pay capital gains taxes.  He also stated that he planned "to give the vast majority of my holdings as an outright gift" to MHFM and that he wished to receive "around $30,000" if he departed MHFM (Dimond Decl., Exh. C).  In his Declaration, Defendant Frederick Dimond stated that plaintiff ultimately decided to make all of his assets an outright gift to MHFM, as well as his future inheritance assets.  *Id.,* ¶ 26.  Plaintiff recommended to defendants that MHFM hold his donation in a stock account so that they would have easier access to it (Hoyle Dep., p. 182).  In the August 2005 e-mail to Frederick Dimond, plaintiff did not suggest that any portion of his gift be reserved to revert back to plaintiff upon his departure.  *Id.,* p. 183.

Plaintiff visited MHFM twice during the summer of 2005 and entered the monastery in September 2005 (Hoyle Dep., pp. 50-51).   While at MHFM, plaintiff assisted the defendants in updating and maintaining their website.  *Id.,* p. 53.  He was involved in production work associated with radio discussions and debates about Catholicism.  *Id.*  Plaintiff answered the telephone at MHFM and discussed religious

issues with callers. *Id.,* p. 57.  He managed MHFM's online store, handled all telephone, internet, and mail-generated orders and managed MHFM's database of customers, clients, supporters, and benefactors (Dimond Decl., ¶ 49).

In November 2005, plaintiff made a donation to MHFM of stock worth $1,233,100 which was acknowledged in writing on March 27, 2006 (Item 89, Dimond Decl. Exh. D). In e-mail correspondence from his tax preparer dated January 91, 2006, plaintiff was advised that the tax preparer treated plaintiff's stock donation "as gifts to qualifying 501(c)(3) organizations" and that he needed a receipt from MHFM before his 2005 taxes could be filed (Item 89, Dimond Decl., Exh. E).  At the time of this transfer of stock to MHFM, plaintiff reserved several hundred thousand dollars of additional assets in his own name (Hoyle Dep., p. 223).  There was no written agreement regarding an amount of that transfer to MHFM that would be reserved and returned to plaintiff upon his departure. *Id.*

In April 2006, plaintiff intended to make another million dollar donation to MHFM when he received the assets of a trust fund.  At that time, plaintiff prepared a second document that acknowledged a gift to MHFM of $750,00.00.  Frederick Dimond testified that this second receipt was prepared based on the expectation of an additional million dollar gift and that, should it receive another million dollars from plaintiff, MHFM would have "the flexibility to possibly give him $438,000 back" if he left the monastery (Item 97, Dimond Dep., p. 65).[4]  Defendant Dimond stated that there was never any agreement, either written or verbal, or any "guarantee that [plaintiff] would receive

---

[4] $483,000.00 is the difference between the amount of plaintiff's donation of 1.2 million dollars and the later-acknowledged amount of $750,000.00.

money back" if he left MHFM  *Id.,* pp. 64-65.  Plaintiff's mother and grandmother blocked the transfer of the additional million dollars to plaintiff until he reached age 35 (Hoyle Dep., pp. 78-79).  On October 1, 2007, defendants acknowledged plaintiff's additional gift of stock worth $307,989 (Item 89, Dimond Decl., Exh. F).  Plaintiff's tax filings for 2005 indicate that plaintiff made a charitable donation to MHFM of $750,000. *Id.,* p. 233.[5]  Plaintiff's 2006 tax return indicated a charitable donation to MHFM of $307,989.  *Id.,* p. 234.[6]

In December 2007, defendant Frederick Dimond decided to move MHFM's stocks and investments from M&T Securities to a Scottrade account and to give plaintiff the authority to transfer funds (Dimond Decl., ¶ 50; Hoyle Dep., p. 62-63).   Plaintiff testified that on December 30, 2007, he read an article on mass attendance by a former member of MHFM  and decided that defendants' position on this issue was wrong (Hoyle Dep., pp. 50, 60).  He did not discuss his disagreement with the defendants, but abruptly decided to leave MHFM.  *Id.,* p. 60.  On the morning of December 31, 2007, plaintiff attempted to transfer funds online from MHFM's Scottrade account into his personal bank account, but was unable to do so because the transaction required a second signature.  *Id.,* p. 66.  Later that day, after he left MHFM, plaintiff telephoned the Scottrade office in Rochester, New York, but the representative would not discuss the account with him.  *Id.,* p. 68.

---

[5]  Plaintiff's 2005 donations resulted in a charitable donation deduction of $384,079.00 against income of $1,061,262.00 for tax year 2005 with an allowable carryover of $269,000 (Hoyle Dep., pp. 229 - 231).

[6]  Plaintiff's 2006 donations to MHFM resulted in a charitable deduction of approximately $35,000.00 against income of $69,000.00 for tax year 2006 and a carryover of $258,000.00 (Hoyle Dep., p. 236).

When he left MHFM, plaintiff took business records with him, including MHFM's bank and investment account records and customer and donor information (Dimond Decl. ¶ 55).  Plaintiff stated that he left MHFM hurriedly and did not have the opportunity to separate MHFM property from his personal property (Item 97, ¶ 40).  He also explained that he promptly offered to return MHFM property to the defendants.  *Id.,* ¶ 41.  Plaintiff took the laptop computer that housed much of MHFM's business information and stated that defendants did not immediately assert ownership of the computer.  *Id.,* ¶ 44.   After leaving MHFM, plaintiff telephoned the New York State Police and reported that the defendants had stolen approximately $460,000 or $470,000 from him (Hoyle Dep., pp. 210-11).  State Trooper LaRose asked plaintiff if he had a written agreement regarding the return of funds, and plaintiff could not recall if there was such a document.  *Id.,* p. 212.

At his deposition, plaintiff testified that he believed he was entitled to the return of money in an amount agreed upon in a conversation he had with Frederick Dimond in approximately April 2006 (Hoyle Dep., p. 71).  Plaintiff further testified that he prepared a handwritten document in which he stated that he was to receive $750,000 if he were to leave MHFM.  *Id.,* p. 74.   Plaintiff does not have the document and does not know whether it was ever signed.  *Id.,* p. 75.

 Following his departure from MHFM, plaintiff set up his own website that condemned MHFM as heretical (Item 55, ¶ 59, Exhs. J, K).  Plaintiff admitted that he contacted MHFM supporters, but denied that he used confidential information to do so (Item 97, ¶¶ 45-46).

8

## DISCUSSION

### 1. Summary judgment Standard

The standard for granting summary judgment is well established.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Gallo v. Prudential Residential Servs., Ltd. P' ship*, 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  *Gallo,* 22 F.3d at 1224.  The moving party bears the initial burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323.  The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment is appropriate if it appears that the nonmoving party cannot prove an element that is essential to the nonmoving party's case and on which it will bear the burden of proof at trial.  *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805–06 (1999); *Celotex,* 477 U.S. at 322; *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004).  In determining whether summary judgment is appropriate, a

court must resolve all ambiguities and draw all reasonable inferences against the

moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587–88 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see*

*also Gallo,* 22 F.3d at 1223.  Summary judgment is improper if there is any evidence in

the record from any source from which a reasonable inference could be drawn in favor

of the nonmoving party.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d

Cir. 1994).  If the moving party meets its initial burden of showing a lack of a material

issue of fact, the nonmoving party must produce evidence in the record and "may not

rely simply on conclusory statements or on contentions that the affidavits supporting the

motion are not credible."  *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir.

1993); *see also Scotto v. Almenas,* 143 F.3d 105, 114–15 (2d Cir. 1998).

## 2.  Defendants' Counterclaims

Defendants seek summary judgment on their counterclaims for defamation,

conversion, misappropriation of trade secrets, breach of fiduciary duty, violation of the

Lanham Act, and violation of the ECPA.[7]  The court will address these counterclaims in

turn.

### A.  Defamation

Defendants allege that plaintiff told New York State Trooper Larry LaRose and

other named individuals, including donors and customers of MHFM, that the defendants

stole money from him (Item 43, ¶¶ 180-185).  "Defamation is the injury to one's

reputation either by written expression, which is libel, or by oral expression, which is

---

[7] Defendants have not sought summary judgment on the counterclaim alleging interference with prospective advantage/tortious interference with contract (Item 43, ¶¶ 206 - 214).

slander." *Idema v. Wager*, 120 F.Supp.2d 361, 365 (S.D.N.Y. 2000), *aff'd,* 29 Fed.

Appx. 676 (2d Cir. 2002).  The elements of a cause of action for defamation under New

York law are: (1) a defamatory statement of fact about the plaintiff, (2) that is false, and

(3) published to a third party; (4) fault on the part of the speaker (either negligence or

actual malice, depending on the status of the libeled party); and (5) either special harm

or slander per se.  *Albert v. Loksen*, 239 F.3d 256, 265–66 (2d Cir. 2001); *Celle v.

Filipino Reporter Enter. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000).  Under New York law,

words are per se defamatory if they import criminal activity, impute certain types of

disease, would tend to injure a party's trade, occupation or business, or impute certain

sexual conduct. *Epifani v. Johnson*, 882 N.Y.S.2d 234, 234 (App. Div. 2009); *Pure

Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F.Supp.2d 489, 550

(S.D.N.Y. 2011).

Plaintiff argues that the truth of his statement, that defendants "stole" his money,

is a defense to the defamation claim.  It is well-established that truth provides a

complete defense to a claim of defamation.  *See Couloute v. Ryncarz*, 2012 WL

541089, *5 (S.D.N.Y. February 17, 2012).  Plaintiff has alleged that he was entitled to

the return of a certain amount of money upon leaving MHFM.  He argued in response to

the motion for summary judgment that he reduced this figure to writing but that the

document was no longer available.  Defendants contend that no such document

existed, no understanding was reached, and plaintiff intended to transfer his funds to

MHFM without reservation.  The record indicates that the defendants acknowledged

plaintiff's monetary gifts in varying amounts and at times not contemporaneous with the

donation for plaintiff's tax purposes.  Additionally, Frederick Dimond stated that a specific receipt was prepared to allow MHFM the "flexibility" to refund certain amounts to plaintiff in the event of an additional million dollar gift (Item 97, Dimond Dep., p. 65). It appears that the parties engaged in what could be characterized as "creative accounting," the purpose of which is not entirely clear on the record.

The court did not have the occasion to consider plaintiff's contention that the defendants wrongfully withheld any amount of funds because plaintiff framed his equitable claims as based on the assertion that he was misled as to the establishment of MHFM as a Benedictine community.  The court concluded that a  resolution of the claim as pled required an examination of doctrinal issues that was prohibited by the First Amendment.  In the context of defendants' motion for summary judgment on their counterclaim for defamation, however, plaintiff has raised a genuine issue of fact with regard to the defense of truth.  If the finder of fact were to credit plaintiff's contention that he and the defendants had come to an agreement regarding the return of funds upon plaintiff's departure from MHFM, then the defendants' refusal to honor that agreement could be considered theft.  Accordingly, the court concludes that plaintiff has established a genuine issue of material fact and defendants' motion for summary judgment on this counterclaim is denied.

### B.  Conversion

Defendants further allege that, when he left MHFM on December 31, 2007, plaintiff took proprietary and confidential business records and materials (Item 43, ¶ 217).  Specifically, they allege that plaintiff took computer databases containing

customer and donor contact information, as well as financial records.[8]  On July 23,

2008, the court granted defendants' application for injunctive relief and ordered plaintiff

to return to defendants all confidential and proprietary records and/or to destroy his

electronic copies of those records (Item 23).  It is unclear whether the defendants

sought the return of the personal computer, or simply the electronic information stored

therein.

Under New York law there are two critical elements to a claim of conversion: "(1)

plaintiff's possessory right or interest in the property and (2) defendant's dominion over

the property or interference with it, in derogation of plaintiff's rights."  *Colavito v. N.Y.*

*Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006) (citations omitted).

Plaintiff has admitted that he took business records upon his departure from MHFM, but

explained that he left MHFM hurriedly and took only those records that were with his

own personal possessions (Hoyle Dep., p. 161).  Additionally, plaintiff took his personal

computer which contained the e-mail addresses of many of MHFM's customers and

supporters, along with e-mail archives and Pay-Pal receipts.  *Id.,* p. 54.  Defendants

contend that plaintiff donated this computer to MHFM (Dimond Decl., ¶ 56).

While there is no "good faith" defense to conversion, *see In re Allou Distrib., Inc.,*

446 B.R. 32, 77 (Bankr. E.D.N.Y. 2011), there is a factual dispute as to the ownership

of the computer.  Moreover, if plaintiff rightfully took the personal computer, the finder of

fact could conclude that he was also within his rights to take the information stored

---

[8]  While defendants have alleged that plaintiff wrongfully took financial documents and business records, the only damages they have complained of arose as a result of the alleged conversion of electronic information.

therein, at least until the defendants demanded its return.  "Where the original

possession is lawful, a conversion does not occur until the defendant refuses to return

the property after demand or until he sooner disposes of the property."  *Schwartz v.*

*Capital Liquidators, Inc.,* 984 F.2d 53, 54 (2d Cir. 1993) (quoting *Johnson v. Gumer,*

464 N.Y.S.2d 318, 319 (App. Div. 1983).  On July 23, 2008, the court granted

defendants' application for injunctive relief and ordered plaintiff to return to defendants

all confidential and proprietary records and/or to destroy his electronic copies of those

records (Item 23).  Plaintiff advised the court of his compliance with this order in an

affidavit filed August 8, 2008 (Item 30).

As plaintiff has raised genuine issues of material fact regarding his ownership of

the property allegedly converted, defendants' motion for summary judgment on the

conversion counterclaim is denied.

### C.  Misappropriation of Trade Secrets

Defendants allege that plaintiff took defendants' computer databases of its

supporters, donors, and customers when he left MHFM on December 31, 2007.  They

argue that this proprietary information constituted trade secrets and plaintiff's

misappropriation of it has allowed him to compete directly with MHFM for donations and

to defame the defendants (Item 43, ¶ 238).  To bring a claim for the misappropriation of

trade secrets, a plaintiff must allege that "(1) [defendant] possessed a trade secret, and

(2) defendant is using that trade secret in breach of an agreement, confidence, or duty,

or as a result of discovery by improper means."  *Integrated Cash Management Serv.,*

*Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 173 (2d Cir. 1990).

The issue on this motion is whether customer contact information is considered a "trade secret."  New York courts apply six factors to determine whether an item qualifies as a trade secret:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Ashland Mgmt. Inc. v. Janien*, 624 N.E.2d 1007, 1013 (N.Y. 1993) (quoting Restatement of Torts § 757, comment b) (internal brackets omitted).  A customer list is not on its face a trade secret.  *Friedman v. Wahrsager,* 848 F.Supp.2d 278, 302 (E.D.N.Y. 2012).  "A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable.  However, the owner is entitled to such protection only as long as he maintains the list in secrecy."  *Defiance Button Machine Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1063 (2d Cir. 1985) (internal citations omitted); *see also Leo Silfen, Inc. v. Cream,* 278 N.E.2d 636, 640 (N.Y. 1972) ("[W]here the customers are not known in the trade or are discoverable only by extraordinary efforts courts have not hesitated to protect customer lists and files as trade secrets.").

Plaintiff contends that MHFM's customer information was readily available and not maintained in secrecy.  The record reflects that plaintiff assisted the defendants in updating their website, managed MHFM's online store, handled all telephone, internet, and mail-generated orders and managed MHFM's database of customers, clients,

15

supporters, and benefactors on his personal computer (Dimond Decl., ¶ 49).  Even if it

is established that plaintiff intended to donate the computer to MHFM, it is not disputed

that plaintiff had access to the computer and the information stored therein.

Accordingly, the court concludes that a determination as to whether MHFM's customer

information constitutes a trade secret is a question of fact, inappropriate for resolution

on this motion for summary judgment.  *See, Friedman,* 848 F.Supp.2d at 302

(determination whether customer list is a trade secret is a question of fact); *Ashland*

*Mgmt., Inc. v. Janien,* 624 N.E.2d at 1013 (question of secrecy is generally one of fact).

Defendants' motion for summary judgment on this counterclaim is therefore denied.

### D.  Breach of Fiduciary Duty

Defendants allege that plaintiff had a fiduciary duty to the defendants by virtue of

his entry into MHFM and participation in monastic life, and that he breached this

fiduciary duty when he "took defendants' property without permission, when he made

false statements about defendants' honesty and business conduct, and when he used

confidential and proprietary business information of MHFM to his own economic

advantage and to MHFM's detriment."  (Item 43, ¶ 229).  In New York, a claim for

breach of fiduciary duty consists of the following elements: "(1) the existence of a

fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly

caused by the defendant's misconduct."  *Rut v. Young Adult Inst., Inc.,* 901 N.Y.S.2d

715, 717 (App.Div. 2010) (citation omitted).  "A fiduciary relationship exists under New

York law when one [person] is under a duty to act for or to give advice for the benefit of

another upon matters within the scope of the relation."  *Flickinger v. Harold C. Brown &*

*Co.*, 947 F.2d 595, 599 (2d Cir. 1991) (alteration in the original) (internal quotation

marks and citations omitted).

> Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another. Such a relationship might be found to exist, in appropriate circumstances, between close friends or even where confidence is based upon prior business dealings.

*Penato v. George*, 383 N.Y.S.2d 900, 904–05 (App.Div.1976) (citations omitted). The

determination of a fiduciary relationship is generally a "fact-sensitive" inquiry.  *Berman*

*v. Rotterman,* 2011 WL 2149431, *5 (W.D.N.Y. June 1, 2011).

The relationship between plaintiff and the defendants is not easily categorized.

Plaintiff acted, at times, as a student or colleague of the defendants.  At other times, he

acted more as an employee or agent, although there is no evidence that plaintiff earned

any salary for his efforts.  There is no question but that defendants were in a superior

position to plaintiff as to their knowledge and authority in the monastery hierarchy.  To

the extent that plaintiff has argued that the defendants held his assets temporarily while

he resided at MHFM, it could be argued that defendants owed a fiduciary duty to the

plaintiff.  In any event, the court finds genuine issues of fact regarding the existence of

a fiduciary relationship between the parties.  Accordingly, the motion for summary

judgment on this counterclaim is denied.

### E.  Unfair Competition under the Lanham Act

Defendants allege that plaintiff "made a false or misleading representation

regarding the nature, characteristics, or quality of MHFM's services" in violation of the Langham Act, 28 U.S.C. § 1125, *et seq.* (Item 43, ¶ 201).  Specifically, defendants allege that plaintiff set up a competing website and solicited donations using defendants' customer contact information.  Section 43(a) of the Lanham Act prohibits the use in commerce or in connection with any goods or services, "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion . . .." 15 U.S.C. § 1125(a)(1)(A).  A party establishes liability under Section 43(a) of the Lanham Act if it can demonstrate "(1) that it has a valid trademark entitled to protection under the Act, and (2) defendant's actions are 'likely to cause confusion.'"  *Phillip Morris USA Inc. v. Marlboro Express,* 2005 WL 2076921, *4 (E.D.N.Y. August 26, 2005) (quoting *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 390 (2d Cir. 1995)).

Defendants have not established either that they have a valid trademark entitled to protection or that plaintiff's actions are likely to cause confusion as to the source of the product or goods.  Here, it is quite apparent that plaintiff's website is not the creation of MHFM and no consumer could be confused as to the source of the product. The gravamen of defendants' claim is that plaintiff used their customer contact information to establish a competing website.  This alleged conduct is subsumed by the defendants' other causes of action.

Although plaintiff did not make a formal motion seeking summary judgment on defendants' counterclaims, a summary judgment motion "searches the record" and thus the court may grant summary judgment to the non-movant where justified by the

evidence in the record, even in the absence of a cross motion.  *MyPlayCity, Inc. v. Conduit Ltd.,* 2012 WL 1107648, *17 (S.D.N.Y. March 30, 2012); *Aviation Dev. Co. v. C & S Acquisition Corp.,* 1999 WL 123718, at *2 (S.D.N.Y. March 8, 1999), *aff'd,* 201 F.3d 430 (2d Cir. 1999); 10A Wright, Miller & Kane, Federal Practice & Procedure: Civil 3d § 2720 at 347–52 ("The weight of authority ... is that summary judgment may be rendered in favor of the opposing party even though the opponent has made no formal cross-motion under Rule 56.").  As the defendants have failed to set forth any proof tending to suggest a violation of the Lanham Act, the court finds it appropriate to dismiss this counterclaim *sua sponte.*

### F.  Electronic Communications Privacy Act

Finally, defendants allege that plaintiff accessed electronic communications between MHFM and its benefactors, donors, and customers and used the information to his own advantage in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq.*("ECPA") (Item 43, ¶ 243).  Essentially, defendants allege that plaintiff used e-mails and other data stored in MHFM's databases to communicate with the donors and customers of MHFM.

The ECPA provides a civil cause of action against persons who intentionally "intercept" electronic communications.  Courts addressing the meaning of "intercept" narrowly define it to include only "acquisitions of communication contemporaneous with transmission, not storage."  *Conte v. Newsday, Inc.*, 703 F.Supp.2d 126, 139 n. 11 (E.D.N.Y. 2010); *see e.g., Fraser v. Nationwide Mut. Ins. Co.,* 352 F.3d 107, 113–14 (3rd Cir. 2003) (following Fifth, Ninth, and Eleventh Circuits and adopting the narrow

definition); *United States v. Meriweather*, 917 F.2d 955, 960 (6th Cir. 1990).  Courts previously employed this narrow definition when interpreting ECPA's predecessor, the Omnibus Crime Control and Safe Streets Act of 1968, and after reviewing the legislative history, the Fifth Circuit concluded that Congress intended to retain this definition under the ECPA.  *See Steve Jackson Games, Inc. v. U.S. Secret Serv.*, 36 F.3d 457, 460–62 (5th Cir. 1994); *see also Konop v. Hawaiian Airlines, Inc.,* 302 F.3d 868, 876 (9th Cir. 2002).  While the Second Circuit has not addressed this issue, *Conte,* 703 F.Supp.2d at 139 n. 11, the Southern District in *Snyder v. Fantasy Interactive, Inc.,* 2012 WL 569185, *2 (S.D.N.Y. February 9, 2012), adopted the Fifth Circuit's reasoning.  For the same reasons, this court will likewise adopt the narrow definition of "intercept" under the ECPA.  Because defendants have failed to plead or prove any facts suggesting that plaintiff wrongfully acquired the communications during transmission, they have failed to state a viable claim under the ECPA.  Despite the fact that plaintiff made no formal cross motion for summary judgment, *see MyPlayCity, Inc., supra,* the court has searched the record and concludes that it is appropriate to dismiss defendants' ECPA counterclaim.

## CONCLUSION

Defendants' motion for summary judgment on their counterclaims is denied with respect to defendants' counterclaims for defamation, conversion, misappropriation of trade secrets, and breach of fiduciary duty.  The court *sua sponte* grants summary judgment to plaintiff dismissing defendants' counterclaims alleging violations of the

Lanham Act and the ECPA.

The parties will participate in a telephone conference on April 24, 2013 at 1:30

p.m. to schedule further proceedings.

So ordered.


_____\s\ John T. Curtin_____
JOHN T. CURTIN
United States District Judge

Dated:   March 14, 2013
p:\pending\2008\08-347.feb112013